OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents an interesting and important question about the continued viability of the breach-date rule in the conversion of foreign currency judgments to United States dollars.
PROCEDURAL HISTORY
The Swiss plaintiff commenced the above action for goods *778 sold and delivered and for an account stated in Swiss francs in February 1984. Plaintiff moved for summary judgment; on February 11, 1986 a decision was rendered (Seymour Schwartz, J.) finding for plaintiff in the amount of Swiss francs 71,224 plus interest. Justice Schwartz’s decision further directed a hearing on "the issue of the exchange value of the Swiss Franc to the U.S. Dollar”. The issue was sent to a Referee for determination.
When the parties agreed that the rate of exchange would be determined by reference to the New York Times on the applicable date, the only remaining issue was what date should be established for the dollar valuation of the Swiss francs plaintiff was owed. This legal issue was briefed by both parties, squarely presenting this court with the choice of the traditional New York date-of-breach rule versus the Federal and more modern "date of judgment” rule. On the facts of this case, and for the reasons discussed below, I find the date of judgment to be the appropriate date for conversion so as to achieve maximum fairness and equity to all parties.
FACTS
Plaintiff manufacturers machinery and bills foreign purchases in Swiss francs because its own expenses are incurred in that currency. As a relatively small company, it has no desire to engage in foreign exchange speculation and wants to ensure that its purchasers remit an agreed-upon price to cover plaintiff’s labor costs, manufacturing expenses, etc., plus a reasonable profit.
The United States dollar amount as determined by this court will be used by plaintiff to purchase Swiss francs and must be sufficient to ensure that plaintiff receives the full SF 71,224 owed to it plus legal interest to compensate for defendant’s wrongful withholding of payment for a period in excess of three years.
Plaintiff made nine shipments to defendant between September 23, 1982 and July 20, 1983. As of November 30, 1983, the date of breach, defendant owed plaintiff on these bills a total of Swiss francs 71,224. On that date, the Swiss franc had a value of approximately United States 45 cents. As of December 2, 1986, the date of judgment, according to the New York Times the value of the Swiss franc was United States 60.85 cents. Thus, between the date of the last invoice and the date of judgment the United States dollar has decreased in value by one third vis-á-vis the Swiss franc.
*779 DISCUSSION
Defendant claims that New York law requires application of the breach-date rule.[1] Plaintiff argues that the New York decisions are nowhere near so monolithic as defendant states, and that, because they are ultimately based on equity, no departure from the spirit of those cases would occur by application of the judgment-date rule here. Besides the equity considerations which clearly inform the entire body of case law on this subject, there are two additional broader issues which must be considered in reaching a just and principled result in this case. They are: (1) the inability of American courts to render judgments in foreign currency; and (2) the decline of the American dollar as the universal currency standard with the abandonment of the Bretton Woods Agreement and the gold standard in 1971. These two issues will be discussed, seriatim, before turning to the applicable New York law.

The Requirement of Judgments in Dollars

It is generally unquestioned that there is no power in the State and Federal courts to award judgments in a foreign currency. No cases have been found in which judgments were granted in a foreign currency, regardless of whether the claim was denominated in a foreign currency or based on a judgment of a foreign court rendered in its own currency. Whatever the origin of this rule, it has come under attack on several grounds. As the Committee on Foreign and Comparative Law of the Association of the Bar of the City of New York has written, "Although these rules were tolerable in an age of casual international commerce and relatively constant exchange rates, they are now outmoded for several reasons” (Foreign Currency Judgments: 1985 Report of the Committee on Foreign and Comparative Law, 18 NYU J Intl L & Pol 791 [1986] [Bar Report]). The Committee found, inter alia, that one basis for reexamining the United States rule was to vindicate general principles of the law of damages. It explained, "A court’s refusal to award a foreign currency judgment may threaten an innocent or nonbreaching party with an inequitable diminution of damages or reward him with a windfall *780 profit. As a result, the mere choice of forum may determine even the size of a damage award. When foreign currencies are integral to the agreement of the parties, when (in non-contract actions) a plaintiff suffers a loss most appropriately expressed in a currency other than dollars, or when a litigant seeks enforcement of a foreign judgment expressed in a foreign currency, a judgment of a U.S. court expressed in a foreign currency may be the most compensatory and therefore the most appropriate remedy.” (Id., at 792.)
The desire to make an award which will be "accurate” in the currency of the party suffering loss, as well as consistent with general principles of the law of damages, has resulted in a change in British law. In Great Britain, foreign currency judgments, totally unavailable before 1975, are now permissible under a number of circumstances (see, Law Commission, Private International Law: Foreign Money Liabilities: Report on a Reference Under Section 3 [1] [c] of the Law Commission Act 1965, No. 124 [1983]).[2] The Association of the Bar has recommended a similar change in United States law (Bar Report, op. cit., at 811-812) and the proposed revision of the Draft Restatement (rev) of Foreign Relations Law of United States § 853 (Tentative Draft No. 5, 1984) takes the same position.[3]
The instant case is a classic example of the problems which exist under the "dollars only” rule. A judgment in Swiss francs, the currency designated by plaintiff, contracted for by defendant and used by plaintiff in its own commercial and internal transaction would best make plaintiff "whole” without creating either a windfall or an unfair burden. Since, however, such an award is presently unavailable in New York or anywhere in the United States, variations on the currency-conversion rules must be considered to produce a result as *781 similar as possible to that which would occur were a foreign currency judgment possible.[4]

Decline of United States Hegemony and the Unstable Dollar

Many of the problems which flow from the unavailability of foreign money judgments are actually a result of worldwide currency fluctuations over which the courts have no control. Until recently, the dollar was the preeminent and preeminently stable currency in the world, the currency against which, at least from the Bretton Woods Agreement of 1944,[5] all other currencies were measured.
The postwar European economies were too weak in the short run to float their currencies against the dollar without substantial exchange controls. For the United States dollar to effectively fulfill its dual function as national currency and international reserve currency backed by gold the United States was required to supply the world with sufficient dollars to permit steady growth and accumulation. (Krieger, Reagan, Thatcher and the Politics of Decline, at 115-116 [1986].) This in turn meant that the United States had to run balance of payment deficits and resulted in a decline of the United States share of world exports. (Cohen and Rogers, On Democracy: Towards a Transformation of American Society, at 102 [1984].) Faced with a dangerous run on gold reserves and the first United States absolute deficit, in 1971 President Nixon suspended the United States commitment to convert dollars into gold (or "closed the gold window”) leaving the United States dollar to float in foreign exchange markets (e.g., Block, The Origins of International Economic Disorder, at 196-199 [1977]).
Since 1971, therefore, the United States dollar has not been *782 the standard against which other currencies are measured and indeed it has declined, sometimes precipitously, against such currencies as the German mark and the Japanese yen. As the New York Times recently noted, United States economic decline and the loss of United States political hegemony has created a situation in which "[T]he dollar and other major currencies [may] go on fluctuating dramatically in value, perhaps into the 21st century, because none of the industrial nations can agree on fair exchange rates and the United States lacks the clout to impose standards, as it once did”. (Uchitelle, When the World Lacks a Leader, New York Times, Jan. 31, 1988, section 3, at 1.)
The reasons for past judicial confidence that a dollar award would make foreign plaintiffs whole have thus been, and continue to be, seriously undermined by the realities of the world economy. A situation, apparently continuing into the foreseeable future, where the dollar is as likely to be devalued as foreign currency once was, requires rethinking of the premises underlying the breach-date rule and its continued viability.

Prior decisional law is premised on the requirement of an equitable result

The case most frequently cited for the proposition that New York employs the date-of-breach rule is Hoppe v Russo-Asiatic Bank (235 NY 37 [1923]). The Court of Appeals wrote, "In an action * * * to recover damages * * * for breach of contract * * * where primarily the plaintiff is entitled to recover a sum expressed in foreign money, in determining the amount of the judgment expressed in our currency the rate of exchange prevailing at the date of the breach of contract * * * is under ordinary circumstances to be applied.” (Supra, at 39, citing Gross v Mendel, 171 App Div 237 [1st Dept 1916], affd 225 NY 633 [1918]; emphasis added.)
The decision in Gross (supra), a case involving bills of exchange,[6] showed the court’s concern to reach an equitable result. In applying the breach-day rule, the court wrote, "I *783 have been unable, by reason of the peculiar facts involved, to find an authority directly in point, but the rule above suggested, I think, does justice to both parties”. (Supra, at 241.)
This concern for a result "which does justice to both parties” is similarly reflected in the most recent New York case applying the breach-date rule, Librairie Hachette v Paris Book Center (62 Misc 2d 873 [Sup Ct, NY County 1970]). The court there wrote "In this case, the equities favor application of the 'breach-day rule.’ If it were not applied, the defendant would be rewarded for defaulting in his obligation to pay for the merchandise”. (Supra, at 877.)[7] The court also noted, "There should be no rigid rule of thumb” as to which date should apply, and a rule which would work an injustice "should be rejected” (citing Rifkind, Money as a Device for Measuring Value, 26 Colum L Rev 559 [1926]). (Supra, at 877.) Librairie Hachette, of course, was decided prior to Nixon’s abandonment of the gold standard in 1971.
In cases where, because of devaluations, plaintiffs would reap an unfair windfall through application of the breach-day rule, New York courts have not hesitated to reject that rule in favor of judgment date in order to achieve an equitable result. (See, e.g., Metcalf Co. v Mayer, 213 App Div 607 [1st Dept 1925]; Sirie v Godfrey, 196 App Div 529 [1st Dept 1921].) In Metcalf the court wrote
" 'The purchase price of the goods in question was not payable in American dollars * * * It was payable in French francs, and by merely bringing action in this jurisdiction, the plaintiff, I apprehend, acquired no right to a more favorable judgment than she could have obtained had action been brought in France’ * * *
"It follows that the time of the application of the rate of exchange is at the time of the rendition of the judgment.” (Metcalf Co. v Mayer, 213 App Div, supra, at 613-614.)
*784 In Matter of United Shellac Corp. (A. M. Jordan Ltd.) (277 App Div 147 [1st Dept 1950]), the court attempted to distinguish cases employing breach-date and judgment-date rules based on where the contract in question was to be performed. It wrote "Where the suit in this country is based upon an obligation existing under foreign law, to be performed abroad, and the jurisdiction of our courts arises merely from 'the fact that the creditor happens to be able to catch his debtor here’ (Deutsche Bank v. Humphrey, 272 U. S. 517, 519), the amount of the judgment (or award) is adjusted according to the exchange rate which prevails on the day of judgment (Richard v. American Union Bank, 241 N. Y. 163; Metcalf Co. v. Mayer, supra; Sirre v. Godfrey, 196 App. Div. 529; Deutsche Bank v. Humphrey, supra). On the other hand, if the contract is to be performed here, then the exchange rate to be applied is that which obtained at the time of default, when the contract was broken (Hicks v. Guinness, 269 U. S. 71; Hoppe v. Russo-Asiatic Bank, 235 N. Y. 37, explained on the basis of this distinction in Richard v. American Union Bank, supra; 5 Williston on Contracts [Rev. ed.], § 1410A).” (Supra, at 152-153.) In reading subsequently decided cases, this distinction, neat as it might be, does not appear to hold up. This is not surprising given the overriding concern for an equitable result, which no rigid rule or distinction could guarantee.
The collected decisions of the New York courts thus compel the conclusion that, rather than rigid application of breach date (or any other date, for that matter), the consistent, repeated, controlling concern is to "do justice to the parties” including consideration of particular currency fluctuations where appropriate. In a time of substantial fluctuation in the value of the dollar against other currencies, as now, the real New York "rule” may well require increasing use of the date of judgment as the appropriate time for measuring conversion of a plaintiffs foreign currency entitlement into dollars.
CONCLUSION
Careful reading of the New York cases demonstrates that there has never been a strict rule requiring use of the breach date in currency conversions. Instead, the courts have consistently looked at the surrounding circumstances to reach a just and equitable result. Because the United States dollar was, until 1971, the preeminent currency in the world, and because currencies "floated” against the dollar the breach-day rule was *785 most generally appropriate. With the dramatic changes which have occurred in the world monetary system over the past 20 years, the situation is far more complicated. Unless and until courts are empowered to award judgments in the foreign currency denominated by the parties, courts will be required to choose a date for conversion which, under the particular circumstances of the case, affords a fair and equitable result. In the instant case, that date, because of the continuing fluctuation of the United States dollar against the Swiss franc, must be the date of judgment.
The clerk is directed to enter a judgment for plaintiff in the amount of $42,734 representing conversion on the date of judgment, with interest from November 30, 1983 to date and statutory costs.

. As recently as 1981 the Second Circuit has adhered to this overly formalistic view of our law, writing "As a federal court sitting in diversity, we must apply the currency-conversion rule employed by the courts of New York, which has followed the breach-day rule for many years” (Vishipco Line v Chase Manhattan Bank, 660 F2d 854, 865 [2d Cir 19811).

. A British rule which had prohibited foreign currency judgments was recently abrogated by the House of Lords (see, Bar Report, op. cit., at 793-795) and other countries historically have allowed foreign currency judgments. (See, Mann, The Legal Aspect of Money, at 310-314 [4th ed 1982].)

. In support of this recommended change, the Draft Restatement notes, "The objective of civil money judgments is, in general, to place the judgment creditor (i.e., the injured party) in a position as close as possible to that in which he would have been if the obligation had been carried out by the judgment debtor or if the injury had not occurred.” (Restatement [rev] of Foreign Relations Law of United States § 853, comment c [Tentative Draft No. 5, 1984].)

. This is necessary to place foreign litigants on an equal basis with litigants whose causes of action involve domestic transactions with dollar values. Parties who lose sums in dollars, sue to recover them in dollars, and obtain dollar judgments face none of the damnation or, at least potentially, windfall which may occur in currency conversion cases. There may of course be a "loss” due to decrease in buying power of the award because of the inevitable time delay and inflation; but this is a risk (ameliorated partially by the award of interest) shared by all litigants alike.

. Following the conclusion of World War II, in a conference which took place in Bretton Woods, N. H., governmental leaders and economists reformed the international monetary system, adopting an adjustable-peg system of exchange rates and establishing the International Monetary Fund (I.M.F.) to oversee it. Each country agreed to declare a par value for its currency in terms of gold or another currency pegged to gold — usually the United States dollar. (E.g., Block, The Origins of International Economic Disorder, at 50-52 [1977].)

. One of the bases of the court’s holding in Gross v Mendel (171 App Div 237, affd 225 NY 633) was the concept of "reexchange” which it found applicable in bill of exchange cases. In those cases, the "commodity” which has been exchanged is itself money — not goods as here and in other cases which have applied the judgment-date rule. The court (citing 2 Daniel, Negotiable Instruments § 1445 [6th ed]) defined reexchange as " 'The amount for which a bill may be purchased in the country where the original bill is payable, drawn upon the drawer in the country where he resides, *783 which will give the holder a sum exactly equal to the amount of the original bill at the time when it ought to be paid, or when he is able to draw the reexchange bill, together with expenses and interest; for that is precisely the sum which the holder is entitled to receive, and which will indemnify him for its nonpayment.’ ” (Supra, 171 App Div, at 240.)

. In Librairie Hachette v Paris Book Center (62 Misc 2d 873) the plaintiffs claim was in French francs. Subsequent to the date of breach the franc was devalued. Understandably, the defendant urged that the rate of exchange on the date of judgment should control, since, as the court noted, this would make a "substantial” difference — in defendant’s favor — in the amount he would be obligated to pay.